# Wellington R. Burt, Appellee, v. Garden City Sand Company, Appellant.

## Gen. No. 14,070.

1. CONTRACTS—*what not implied.* The court is not justified in reading into a written contract a provision which the parties to it have failed to insert, simply because from one point of view it would have been reasonable or desirable. Where the parties have made distinct and explicit undertakings, an undertaking will not be implied which would impose a new and additional obligation.

2. CONTRACTS—*what breach justifying rescission.* The non-payment of an installment due under a contract is a material breach justifying rescission and suit for whatever may be due under such contract.

3. CONTRACTS—*what evidence competent to establish excuse of failure to make prompt deliveries.* Where a contract is to deliver merchandise and requires the seller to use all reasonable efforts to make shipments as rapidly as possible, it is competent for such shipper to show, by way of excuse for failure to make shipments, his inability to obtain cars.

4. WARRANTIES—*how proof of must be made.* The law never presumes a breach of warranty; warranty is an affirmative defense which must be established by evidence.

5. WARRANTIES—*what does not tend to establish breach of.* Where the contention is that cement delivered was not up to contract grade, tests of such cement made after it had been subjected to conditions which would change its qualities and which did not tend to show its condition or qualities at the time and place of delivery, are not competent.

Assumpsit. Appeal from the Municipal Court of Chicago; the Hon. EDWARD A. DICKER, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1907. Affirmed. Opinion filed June 16, 1908.

**Statement by the Court.** This suit was brought by Wellington R. Burt, doing business as Burt Portland Cement Company, against the Garden City Sand Company to recover an amount alleged to be due him from the Garden City Sand Company for cement delivered to the latter company on its orders under the terms of the following contract between the parties:

"This contract or agreement made and entered into this first day of January, 1906, by and between the Burt Portland Cement Company (W. R. Burt, of Saginaw, Michigan, being the owner thereof), party of the first part, and the Garden City Sand Company of Chicago, an Illinois corporation, party of the second part:

"Witnesseth that the party of the first part agrees to sell and the party of the second part agrees to buy the entire output of cement manufactured during the year 1906 by the party of the first part at their cement plant located at Bellevue, Michigan, at an agreed price of One Dollar and Eight Cents ($1.08) per barrel in bulk f. o. b. cars Bellevue, Michigan, for all cement purchased from March 1st, 1906, to December 31st, 1906, inclusive.

"It is further agreed that the price on all cement purchased during January and February, 1906, shall be One Dollar and Five Cents ($1.05) per barrel in bulk f. o. b. cars Bellevue, with the exception of about 65,000 barrels already sold, orders for which will be mailed by the Garden City Sand Company, at once, the price on these orders to be One Dollar ($1.00) per barrel in bulk at Bellevue, and on these orders a commission of eight per cent. (8%) is to be paid to the Garden City Sand Company.

"It is agreed that payment for all cement shipped during any month shall be made the fifteenth (15th) day of the second month following, that is, all January shipments shall be paid for March 15, 1906, and in like manner for each month during the entire year.

"The Burt Portland Cement Company agrees to furnish cement that will pass the specifications of the American Society of Civil Engineers and also of the Board of Local Improvements of the City of Chicago for work for the City of Chicago. Said specifications being herewith attached and making part of this contract and should the party of the second part at any time sell a large amount of cement and it should be turned back on their hands if it is the fault of the cement the party of the first part shall pay the difference which the contractor may have to pay for some other brand of cement to fill above specifications

and if it is not the fault of the cement, party of the first part shall not be held to make up the difference.

"Said party of the first part also agrees to carry 35,000 barrels of cement in stock before party of the first part shall go into the market because of failure of party of the second part to dispose of the product. In case it should become necessary for party of the first part to go into the market to dispose of the product on account of the accumulation over and above the 35,000 barrels above mentioned, party of the first part still agrees to fill orders for party of the second part (after the surplus is disposed of) at the agreed contract price of One Dollar and Eight Cents ($1.08) per barrel.

"It must be distinctly understood that party of the first part guarantees their cement to pass all requirements and specifications of the American Society of Civil Engineers but will not guarantee work done with it except under their supervision. In case of objection to the quality of the cement by any customer of party of the second part said second party will settle the matter themselves with the customer, the idea being that while party of the first part can guarantee their cement they cannot guarantee other people's working of it.

"Party of the first part agrees in case of claims for damages to investigate and give their expert opinion where it is mutually agreed it is necessary.
                                    "Burt Portland Cemt. Co.
                                              "By W. R. Burt.
"The Garden City Sand Co.
        . "By C. B. Shefler,
                              Prest."

The evidence in the record tends to show that appellee was doing business in the beginning of 1906, when the contract was made, as the Burt Portland Cement Company, at Bellevue, Michigan, engaged in manufacturing cement. His plant was located there, and it was operated with some interruptions until about the close of October of that year. At various times the operation of the plant was interrupted or hindered by various causes, such as the scarcity of labor, scarcity

of coal, the limited supply of water in the river from which the supply of water for use in the plant was obtained. The shipments of cement from the plant were delayed by scarcity of cars. Some delay in the manufacture resulted from the necessity of moving the steam shovel for the purpose of obtaining better raw material, and also from an explosion at the mill in September, and the consequent demoralization of the working force of the mill. When there appeared any likelihood of a shut-down or delay for any reason, the correspondence in evidence shows that appellee notified appellant so that it could make its plans accordingly, and adjust its business thereto as far as possible or necessary. During the first three months of the year appellant ordered little cement. It sent in orders for large amounts which were mere estimates of the amounts which it would need, but cement was not to be shipped thereon until confirmative orders were given containing shipping instructions. These confirmatory orders came in so slowly during the early part of the year that appellee wrote many letters urging appellant to order more cement, and to provide storage for a large quantity of cement in Chicago, so as to keep appellee's factory clear and render it unnecessary for appellee to go into the market to sell cement. Later in the season appellant commenced to send in orders faster than appellee could fill them, but when the contract was terminated in October, appellee was within a few days shipment of all orders received at that time.

Appellee's shipments of cement were by months as follows: January 2,475 barrels; February 5,195 barrels; March 16,087½ barrels; April 37,460 barrels; May 40,466½ barrels; June 20,084 barrels; July 25,953 barrels; August 21,944 barrels; September 18,995½ barrels, and October 6,844 barrels.

The payment for the August shipments fell due under the contract on October 15, 1906. The amount of that payment, after giving credits for sacks, etc., re-

turned, was $21,976.26. Instead of meeting this payment, appellant wrote appellee as follows:

"We make no remittance to you to-day, as we are trying to ascertain where we stand on sales of your cement not filled on our orders by you. The losses will be very heavy to us and will, in all likelihood, much exceed the amount we are owing you. Just as soon as we can do so, we will send you a statement showing the loss to us from your failure to comply with your contract."

When appellant wrote the above to appellee it owed appellee not only the above amount, but also for the September shipments, $20,670.29, which would fall due November 15, and $7,000 for October shipments, which would fall due December 15.

Upon the receipt of the above letter, under date of October 22, 1906, appellee wrote to appellant:

"We want to say to you that unless you pay us what is due on the cement shipped you on or before the 27th of this month, we shall consider the contract annulled. Will you be kind enough to write us at Saginaw whether or not you intend to pay us and go on with the contract."

Shipments of cement were continued up to October 27, 1906, when they ceased, appellant having failed to make the payment demanded. The installments which fell due in November and December were not paid, and in January, 1907, this suit was brought.

The jury on the trial returned a verdict for the plaintiff for $34,464.14, judgment was rendered on the verdict, after overruling a motion for a new trial.

LOESCH, SCOFIELD & LOESCH and E. C. CRAWFORD, for appellant.

HOYNE, O'CONNOR & IRWIN, for appellee.

MR. JUSTICE SMITH delivered the opinion of the court.

It was contended on the trial by appellant that the

careless, negligent and indifferent operation of appellee's plant prior to October 15, 1906, and the communications received by it from appellee to the effect that he expected to close his plant, and that the same would probably remain closed for a period of sixty days, and that he did not know that he would be able to operate it again, justified appellant in declining to pay the amount of money due October 15, 1906, until such time as an estimate of the damage which such course would entail upon it could be made, to the end that it might recoup such damages out of the amount so found due to appellee for cement delivered under the contract at that time.

It was further claimed by appellant that the contract required a reasonable and continued operation of the plant by appellee during the year, and that appellee failed to fulfill his contract in this regard, and consequently fell behind in his shipments on orders from appellant.

At the beginning of the trial it was agreed in substance between the parties that $50,082.31 worth of cement had been shipped by appellee to appellant in August, September and October, 1906, none of which had been paid for by appellant; that appellant had returned sacks, etc., to the amount of $16,735.29 and that there was due appellee from appellant the sum of $34,317.48 with interest, subject to such set-off as appellant might prove, if any, and subject also to appellant's further right to disprove the correctness of any items in appellee's claim if it should be able to do so.

From these contentions and the stipulation of the parties it appears that the dispute between the parties depends in great measure upon the construction of the contract set out in the statement preceding this opinion. The theory on which the trial court proceeded, apparently, was that appellee under the contract was bound to run his mill at its reasonable capacity throughout the year, or to use all reasonable

effort to do so; and on this theory much irrelevant and immaterial evidence was introduced by appellant.

Our opinion is that the court erred in adopting appellant's view of the contract. By the terms of the contract appellant agreed "to buy the entire output of cement manufactured during the year 1906 by the party of the first part at their cement plant, located at Bellevue, Michigan." No specific amount of cement was mentioned in the contract except the 65,000 barrels which were to be manufactured and ordered out at once. There is no dispute that this quantity of cement was manufactured by appellee, but it was not ordered to be shipped by appellant for several months, for some reason not made to appear in the record. The contract in terms did not require appellee to manufacture and ship any other specific amount of cement, nor did it require appellee to run his plant in any particular way or prohibit him from closing his plant whenever he might find it desirable or necessary so to do in the prosecution of his business. If the contract contains any provision which obligated appellee to keep his mill running at its reasonable capacity throughout the year, regardless of whether it would be profitable, or otherwise convenient for him to do so, it is by implication from extraneous facts and not by any express provision. A court is not justified in reading into a written contract a provision which the parties to it have failed to insert, simply because from one point of view it would have been reasonable or desirable.

In the leading case of Aspdin v. Austin, 5 Ad. & El. (N. S.) 67, the doctrine and the reasons therefor are stated with great clearness as follows: ·

"Where parties have entered into written engagements, with express stipulations, it is manifestly not desirable to extend them by implication; the presumption is, that having expressed some, they have expressed all the conditions by which they intend to be bound under the instrument. It is possible that each

party to the instrument may have contracted on the
supposition that the business would in fact be carried
on, and the service in fact continued, during the three
years, and yet neither party might have been willing
to bind themselves to that effect; and it is one thing
for the court to effectuate the intention of the parties
to the extent to which they have, even imperfectly,
expressed themselves, and another to add to the
instrument all such covenants as upon full considera-
tion the court may deem fitting for completing the
intention of the parties, but which they, either pur-
posely or unintentionally, have omitted. The former
is but the application of a rule of construction to that
which is written; the latter adds to the obligation by
which the parties have bound themselves, and is, of
course, quite unauthorized, as well as liable to great
practical injustice in the application."

This is the well-settled law of construction and
interpretation of contracts as announced in all the au-
thorities on this subject; and it forbids the court to
add to the provisions expressed in the contract before
us a new and distinct undertaking.

There is no controversy in the record that appellant
refused to make the payment due, under the contract,
on October 15, 1906. In our opinion, this was a breach
of a material condition of the contract which entitled
appellee to terminate the contract. Keeler v. Clifford,
165 Ill. 544; Dobbins et al. v. Higgins et al., 78 *id*. 440;
L. S. & M. S. Ry. Co. v. Richards, 152 *id*. 59.

Appellant assigns error in the giving of the follow-
ing instruction to the jury:

"The court instructs the jury that the refusal on the
part of the defendant to make payment on the 15th
day of October, 1906, in accordance with the terms of
the contract entered into by and between the parties
amounted to a breach of said contract on its part.

"And you are further instructed, as a matter of law,
that such breach of the contract on its part entitled
the plaintiff to refuse to make any further shipments
of cement under said contract.

"And the court further instructs the jury that the plaintiff, having elected to abandon the contract by reason of such breach on the part of the defendant on and after October 27, 1906, the jury should consider the contract as rightfully terminated on and after said last mentioned date."

The objections made to this instruction are that it assumed that the conduct of appellee did not authorize the action of appellant in withholding the payment due October 15, 1906; and it also assumed that notwithstanding the violation of the terms of the contract by appellee in closing his plant, or so representing to appellant, the contract was still in full force, had not been violated, and that closing the mill was not a breach on the part of appellee which justified the course pursued by appellant.

For reasons given above we think the instruction was proper, and we see no serious objection to it. The law is well settled that the non-payment of the instalment named in the instruction was a breach of a material condition of the contract, and entitled appellee to abandon the contract and sue for the amount actually due thereunder.   Keeler v. Clifford, *supra;* Dobbins v. Higgins, *supra;* L. S. & M. S. Ry. Co. v. Richards, *supra.*

Objection is made to the fifth instruction given at the instance of appellee, to the effect that if the jury believed from the evidence that the cement or a part thereof was defective at the time and place testified to, the appellee was not liable for such defective cement unless they believed from all the evidence such defect existed at the time the cement was delivered on the car or cars at Bellevue, Michigan.

The law never presumes a breach of warranty. Under the stipulation and the evidence in the record, appellee was entitled to recover unless there was a breach of warranty.   That was a matter of defense.   Maltman v. Williamson, 69 Ill. 423; Ryan v. Hooton, 122 Ill. App. 514.   The contract required the cement to be

delivered on board cars at Bellevue, Michigan. If appellant desired to make the defense that the cement did not have the qualities it was warranted to have, the evidence would properly be limited to such as tended to show its condition at the time and place of delivery. Tests made of the cement after it had been subjected to conditions which would change its qualities, and did not tend to show its condition or qualities at the time and place of delivery would not be competent. We think the instruction stated the law applicable to the case correctly.

At the request of appellee the court instructed the jury that if they believed from the evidence that appellee was unable to procure cars in which to make shipments, and that by reason thereof appellee was unable to make shipments at such times, appellee was not liable for damages, if any, caused by not making shipments on that account.

The evidence shows that appellee was at times unable to procure cars in which to make shipments. It appears also that appellee shipped all the cement for which he had received shipping instructions, except about fifteen hundred barrels, or two or three days' shipments, when he finally discontinued all deliveries of cement for the reason above stated. The contract does not stipulate that any particular amount should be shipped at any particular time. And, moreover, on appellant's theory of the contract, appellee was bound only to use all reasonable efforts to ship the cement as rapidly as possible. In view of the evidence and the provisions of the contract, we see no error in the instruction.

Exception is taken by appellant to the instruction given at the request of appellee in regard to alleged defective cement which had been retained by appellant when it had been requested by appellee to return such cement. The instruction told the jury that such cement was accepted in fulfillment of the contract. We think this instruction was correct upon the fa-

miliar principle stated in De Kalb Implement Works v. White & Co., 59 Ill. App. 171.

From what we have said above as to the burden of proof where a party is claiming damages for a breach of warranty, and under the authority of Morris v. Wibaux, *supra,* we are of the opinion that the proposition of law contained in the second instruction given at the instance of appellee is sound.

The first instruction given at the request of appellee states that if the jury believe from all the evidence that appellee delivered to appellant cement of a quality inferior to that contracted to be delivered, and if they further believe from the evidence that appellant or the parties to whom the cement was delivered could have discovered said inferior quality by the use of reasonable diligence before the same was used, as claimed, then no damages could be recovered against appellee by reason of defective work, if any, caused by the use of such cement. The objection to this instruction, it is said, is to be found in the words, "or the parties to whom the cement was delivered."

If the parties to whom the cement was delivered could by reasonable diligence have discovered before using the same that the cement was defective, then appellant had the means of discovering that fact. The instruction does not assume as a fact that the parties to whom the cement was delivered always had the means of discovering its defective quality. The record shows, however, that in many cases the cement could have been tested by the city engineers of the respective cities where used, or otherwise tested. If appellant's customers used any cement which they knew, or by the exercise of reasonable diligence could have known, to be defective, they could not claim damages against appellant for defective work done with the same, and appellant, therefore, ought not to be permitted to claim damages on that ground against appellee. We do not think there was reversible error in the instruction.

Appellant concedes in argument that the evidence, being conflicting, its weight was for the jury, and it does not ask a reversal of the judgment upon the merits. We find no reversible error in the record, and the judgment is affirmed. The cost of the supplemental abstract of record must be taxed against appellant.

*Affirmed.*